UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CINDY M. W.,[1]<br><br>    Petitioner,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of Social Security Administration,[2]<br><br>    Respondent. | Case No. 4:20-cv-00387-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

# INTRODUCTION

Pending before the Court for consideration is Cindy W.'s Petition for Review of the Respondent's denial of social security benefits, filed on August 5, 2020. (Dkt. 1.) The Court has reviewed the Petition for Review, the parties' memoranda, and the administrative record (AR), and for the reasons that follow, will remand the decision of the Commissioner for further proceedings.

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] Kilolo Kijakazi is substituted for Andrew Saul pursuant to Federal Rule of Civil Procedure 25(d). Kijakazi became the Acting Commissioner of Social Security Administration on July 9, 2021.

**MEMORANDUM DECISION AND ORDER - 1**

# BACKGROUND

A.   **Procedural Background**

Petitioner filed a Title II application for disability insurance benefits on October 10, 2016, claiming disability beginning January 15, 2014. The application was denied initially and on reconsideration, and a hearing was conducted on January 16, 2019, before Administrative Law Judge (ALJ) Christopher Inama. After considering testimony from Petitioner and a vocational expert, ALJ Inama issued a decision on May 30, 2019, finding Petitioner not disabled.

Petitioner timely requested review by the Appeals Council, which denied her request for review on June 2, 2020. Petitioner timely appealed this final decision to the Court.

The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g). At the time the ALJ issued his written determination, Petitioner was fifty-seven years of age. Petitioner has a Ph.D., and her prior work experience includes a career as a professor of pharmacology at Idaho State University.

B.   **Factual Background**

On November 5, 2013, Petitioner sought care for possible diabetes. (AR 393.) She reportedly was physically fit and active, with no family history of diabetes. (AR 393.) She was started on Metformin 500 mg. oral tablet, given a glucose monitor, and test strips. (AR 394.) She was advised to check her glucose every morning and at two other

times during the day until her next appointment. (AR 394.)

On November 14, 2013, Petitioner completed a health history questionnaire. (AR 289.) She reported blurred vision, leg cramps, sluggishness, inability to concentrate, malaise, and heart palpitations with physical activity. (AR 289.) On November 21, 2013, her treating provider diagnosed Type II diabetes, but suspected latent autoimmune diabetes in adults, or LADA. (AR 287.) The treatment provider recommended further testing. (AR 287.) Petitioner saw Dr. Nielsen[3] later that same date, who noted Petitioner's recent A1C level was 9.3, and that even with Metformin, her blood glucose was still often over 200 despite a healthy diet. (AR 391.) Dr. Nielsen suspected LADA as well, and he started Petitioner on Lantus once per day, advising Petitioner to check blood glucose "qid" for fluctuating glucose levels. (AR 392.)

On June 9, 2014, Petitioner sought treatment at the emergency room, where she was later diagnosed with diabetic ketoacidosis and acidosis with an A1C level of 15.2. (AR 333, 338.) Throughout 2015, 2016, 2017, and 2018, Petitioner sought regular care from Dr. Nielsen for diabetes management. (AR 286 – 295; 373 – 401; 412 – 417; 423 – 437; 437 – 454.)[4] At each visit, Petitioner reported fluctuating glucose levels throughout the day. At an office visit with Dr. Nielsen on May 30, 2017, his chart notes indicate that, "patient has been working diligently on her diabetes at home and is a quite 'brittle'

---

[3] Dr. Nielsen ultimately became Petitioner's treating provider for her diabetes.
[4] The record reflects Dr. Nielsen examined and treated Petitioner on April 9, May 13, and December 16, 2015; May 11, October 18, and November 9, 2016; May 30, June 14, October 4, and December 6, 2017; May 23, and September 5, 2018.

**MEMORANDUM DECISION AND ORDER - 3**

diabetic…." (AR 416.) His plan was for Petitioner to return for a CGM diabetes visit. (AR 417.) Petitioner's Dexcom CGM was downloaded for review at her scheduled appointment on June 14, 2017. (AR 412.) Petitioner reported continuing to experience hypoglycemia in the middle of the night and at mid-day. (AR 412.) Dr. Nielsen's treatment plan included Humalog injections "SQ for meals and correction as directed." (AR 414.)

On December 6, 2017, Dr. Lijenquist conducted a consultative examination upon referral by Dr. Nielsen. (AR 419 – 420.) Petitioner reported fluctuating glucose levels, and hypoglycemia reactions every three days, including at night. (AR 419.) Dr. Lijenquist opined that, "generally speaking," Petitioner:

> is very well controlled with her blood sugars and is very conscientious in doing everything right, including giving lead time for her insulin to get into place before she eats. The one thing that she needs to improve upon is carbohydrate counting and we discussed how best to do that. I recommended that she consider getting an electronic scale, which actually measures the carbohydrates in the foods she eats….I feel the patient is doing very well and has no evidence of diabetic complications at this point. The one caveat to that is that she reports her blood sugars at night have to get down to around 50 before she awakens, suggesting that she may be on her way to hypoglycemia unawareness. Should that be true, she would be a candidate for continuous subcutaneous glucose monitoring….

(AR 420.) At a later appointment with Dr. Nielsen on December 19, 2018, it was noted that Petitioner continued to struggle with unpredictable glucose levels, even when consistent with activity, foods, and timing. (AR 424.) She had been using Libre CGM,

**MEMORANDUM DECISION AND ORDER - 4**

which Petitioner reported was helpful for watching her glucose change over time and avoid hypoglycemic events. *Id.*

Dr. Nielsen provided a medical source statement dated January 29, 2019, explaining that Petitioner's fluctuating glucose levels, which cause hypo or hyperglycemia, result in symptoms of fatigue, episodic vision blurriness, general malaise, psychological problems, loss of manual dexterity, headaches, and difficulty concentrating, among other symptoms. (AR 442.) Dr. Nielsen explained that glucose fluctuations cause these symptoms even though average blood sugar as measured by an A1C test is near goal. (AR 441.) Daily logs from Petitioner's CGM document that Petitioner's glucose levels fluctuate frequently, and at unpredictable intervals, throughout the day. (AR 443 – 445.)

Petitioner testified at the hearing that she checks her blood sugar at least eight, and up to twenty, times each day. (AR 44.) When her blood sugar is low or high, Petitioner testified she feels "crappy," the "only way I can explain it is my brain feels thick. Really, brain fog." (AR 45.) When her blood sugar drops below 60, she "can't see straight. I can't focus…I don't know what I'm doing…I lose spatial orientation." (AR 46.)

Petitioner provided also a detailed written daily function report. (AR 192 – 199.) In the report, she states she takes her blood sugar readings several times each day and once during the night. (AR 193.) She prepares her meals from scratch, which can take up to three hours for main meals because she measures all ingredients to calculate insulin dosing. (AR 194.)

**MEMORANDUM DECISION AND ORDER - 5**

The ALJ determined Petitioner retained the RFC to perform work at the medium exertional level. The ALJ imposed physical and postural limitations, as well as mental limitations in that he restricted Petitioner to "simple and detailed work tasks, but not complex tasks, and would benefit from routine, repetitive work tasks." (AR 18.)

## STANDARD OF REVIEW

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports Petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision

must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

## DISCUSSION

The sole issue Petitioner raises on appeal concerns whether the ALJ properly evaluated the medical opinions of Nels Sather, Ph.D., and Janis E. Eiler, M.D., in formulating Petitioner's residual functional capacity.

Dr. Sather performed a consultative psychological evaluation on May 11, 2017, at the request of Social Security Disability Determinations Services, while Dr. Eiler provided a professional medical opinion at the request of ALJ Inama. Petitioner contends that the ALJ failed to account for the uncontested opinion of Dr. Sather that Petitioner suffered cognitive limitations due to frequently fluctuating blood sugar levels, and the uncontested opinion of Dr. Eiler that Petitioner must be allowed to check glucoses and treat hypo or hyperglycemia "as needed." (Dkt. 20 at 4 – 6.) Petitioner argues that the errors are harmful, because the vocational expert testified that a person who was off task more than 10% of the time during an eight-hour workday in excess of regularly scheduled breaks would be unemployable. (AR 58.)

The Court has reviewed the record, and finds that the ALJ committed error. The Court's findings are explained below.

**MEMORANDUM DECISION AND ORDER - 7**

1.   **Standard for Evaluating Medical Opinions**

In social security cases, there are three types of medical opinions: "those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec.*, 574 F.3d 685, 692 (9th Cir. 2009) (citation omitted). "The medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *1 (S.S.A. July 2, 1996) (stating that a well-supported opinion by a treating source which is not inconsistent with other substantial evidence in the case record "must be given controlling weight; i.e. it must be adopted.").

Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a non-examining, reviewing physician's opinion. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, *see* 20 C.F.R. § 404.1527(d)(3), and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists, *see id*. § 404.1527(d)(5).[5]

---

[5] The agency has amended the regulations governing medical opinions, but they apply only to claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1520c. The ALJ correctly applied the rules applicable to Petitioner's claim, which was filed on October 10, 2016. *See* 20 C.F.R. § 404.1527.

**MEMORANDUM DECISION AND ORDER - 8**

Should the ALJ decide not to give a treating physician's opinion controlling weight, the ALJ must weigh it according to factors such as the nature, extent, and length of the physician-patient relationship, the frequency of evaluations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician. *Trevizo*, 871 F.3d at 676; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Although a "treating physician's opinion is entitled to 'substantial weight,'" *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (citation omitted), it is "not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Rather, an ALJ may reject the uncontradicted opinion of a treating physician by stating "clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

However, "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (citation omitted); *see also* SSR 96-2P, 1996 WL 374188 at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the

**MEMORANDUM DECISION AND ORDER - 9**

treating source's medical opinion and the reasons for that weight."). "The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

### A.   *Dr. Sather's Opinions*

Dr. Sather conducted a consultative psychological evaluation of Petitioner on May 11, 2017. (AR 402 - 408.) During objective testing, Dr. Sather observed that Petitioner's recent memory test required prompting; a test of past memory revealed she could answer five out of seven questions; and she was able to answer eight out of ten information questions. She was unable to do serial sevens but correctly calculated five out of seven simple arithmetic questions. Testing of her abstract thinking abilities revealed she could answer eight out of eight similarity questions, interpret three out of four proverbs, and sensibly answer three out of four judgment questions. Petitioner also completed Trail Making Tests A & B, which evaluate cognitive functioning, including attention, speed, mental flexibility, spatial orientation, visual pursuits, recall, and recognition. Petitioner's performance revealed little or no cognitive impairment at the time of administration of these tests.

However, Dr. Sather qualified the test results as follows:

> It should be noted that these scores do <u>not</u> represent her cognitive functioning when she is experiencing low or high blood sugar, and thus are not representative of her functioning when hypo or hyperglycemia is compromising her cognition. As well documented in medical literature regarding diabetes,

**MEMORANDUM DECISION AND ORDER - 10**

> cognitive compromise caused by blood sugar fluctuations is real and should not be underestimated.
>
> ***
>
> [Petitioner] is able to understand, remember, and carry out both simple and complex oral instructions unless her blood sugar is too low or too high, which happens so frequently that she is unable to function consistently. When blood sugar is an issue, she is unable to understand and follow through with written instructions.
>
> ***
>
> [Petitioner] struggles to sustain attention and persist with tasks due to fatigue and fluctuations in blood sugar.
>
> ***
>
> Her blood sugar fluctuations, which are caused by Type I Diabetes, are likely to continue to cause neurocognitive problems….These symptoms occur when [Petitioner] becomes significantly hypo or hyperglycemic, which occurs for her at unpredictable intervals.

(AR 405, 406.) Dr. Sather concluded that, in his professional judgment, "with a reasonable degree of psychological certainty," Petitioner's ability to perform "work related mental activities such as understanding, remembering, sustaining concentration, and persistence is seriously impaired due to cognitive problems related to fluctuating blood sugar levels." (AR 407.)

The ALJ assigned "little weight" to Dr. Sather's opinion concerning Petitioner's "seriously impaired" ability to understand, remember, sustain concentration, and persist due to Petitioner's fluctuating blood sugar levels and their effect upon cognition. (AR 22.) The ALJ determined this opinion was not supported by the opinions of the state agency physicians who reviewed the record, the mental status examination findings of Dr. Nielsen, Petitioner's activities of daily living, and Dr. Sather's objective test results.

**MEMORANDUM DECISION AND ORDER - 11**

(AR 21, 22.) The ALJ noted Petitioner's performance on the Trail Making Tests A & B, and Dr. Sather's observations that Petitioner appeared alert and oriented, with a normal immediate memory and fair judgment. (AR 21.) The ALJ cited Dr. Nielsen's records between April 2015 and December 2018, which recorded that Petitioner was in no acute distress, and that she exhibited a normal mood, affect, attention span, and concentration. (AR 21.)

Thus, the ALJ did not assess any further mental limitations other than those stated in the RFC determination, which limited Petitioner to simple and detailed work tasks, and routine, repetitive work tasks. (AR 18.)

### B.    *Dr. Eiler's Opinions*

Dr. Eiler, a non-testifying medical expert, was asked to answer written interrogatories. Dr. Eiler offered opinions regarding Petitioner's physical RFC, such as Petitioner's ability to lift and carry; sit, stand and walk; utilize upper and lower extremities; and any postural limitations. (AR 469 – 474.) Dr. Eiler also provided opinions concerning whether Petitioner met or equaled Listing 1.02, 1.04, or 11.14, finding that she did not meet or equal any of the listings under consideration. However, Dr. Elier stated that Petitioner "[m]ust be allowed to check glucoses and treat hypo- or hyperglycemia as needed." (AR 476 – 478.)

The ALJ gave great weight to Dr. Eiler's opinions concerning Petitioner's physical RFC, which included Petitioner's capacity to lift and carry, and postural limitations. (AR 22.) He assigned less weight to other aspects of Dr. Eiler's opinion about Petitioner's

**MEMORANDUM DECISION AND ORDER - 12**

ability to work around unprotected heights, and her ability to sit, stand, and walk. (AR 22.) The ALJ neither mentioned nor addressed Dr. Eiler's opinion regarding Petitioner's need to check her glucose level throughout the day and to treat hypo or hyperglycemia as needed. (AR 22.)

**2.  Analysis**

The Court finds the ALJ failed to provide legally sufficient reasons supported by substantial evidence in the record for rejecting Dr. Sather's and Dr. Eiler's respective opinions, which in turn resulted in a legally erroneous RFC determination.[6]

First, the ALJ failed to provide legally sufficient reasons supported by substantial evidence in the record for rejecting Dr. Sather's opinions regarding Petitioner's cognitive functioning when she experiences low or high blood sugar. The record contains objective evidence that Petitioner's glucose levels fluctuate throughout the day. (AR 443 – 445.) Both Dr. Sather and Dr. Nielsen provided medical source statements concerning the cognitive and physical effects of Petitioner's hypo and hyperglycemic episodes. Yet, the ALJ's reasons for assigning little weight to Dr. Sather's opinions in this regard all depend upon Petitioner's cognitive abilities when unaffected by symptoms of hypo or

---

[6] In determining RFC, the ALJ considers a claimant's ability to meet physical and mental demands, sensory requirements, and other functions. *See* 20 C.F.R.§ 404.1545. Social Security regulations define residual functional capacity as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. 404, Subpt. P, App. 2, § 200.00(c). If an ALJ's hypothetical posed to a vocational expert does not reflect all of the claimant's limitations, then "the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991).

**MEMORANDUM DECISION AND ORDER - 13**

hyperglycemia.

For instance, Petitioner can perform many activities of daily living, and Petitioner did not testify that she was incapable of daily tasks such as preparing meals, driving a car, and attending events. Rather, she testified she could not function well when her blood sugar either spiked above or dipped below certain levels. These fluctuations, as Dr. Sather stated, affected Petitioner's ability to function *consistently* throughout the day, and *maintain* attention and persistence. (AR 405, 406.)

Mental status examinations conducted by Dr. Nielsen at visits occurring three times each year similarly do not account for Petitioner's fluctuating glucose levels and the cognitive impairments they cause on a daily basis. Dr. Nielsen may have charted his observations during brief examinations that Petitioner was in no acute distress, with a normal mood, affect, attention span, and concentration. But, Dr. Nielsen likely examined Petitioner at a moment when Petitioner's cognitive functioning was not impaired by hypo or hyperglycemia. Accordingly, these one-time observations of normal cognitive function do not address Petitioner's ability to maintain cognitive functioning throughout an eight-hour workday.

Similarly, Dr. Sather's acknowledgement that objective testing showed little cognitive impairment at the time he administered the tests is not inconsistent with his statement qualifying the test results. He expressly noted that Petitioner's objective test scores "do not represent her cognitive functioning when she is experiencing low or high blood sugar…" which symptoms occur "frequently" and at "unpredictable intervals."

**MEMORANDUM DECISION AND ORDER - 14**

(AR 405, 406.) Yet, the ALJ completely ignored this aspect of Dr. Sather's opinion. The ALJ predominantly adopted Dr. Sather's finding that Petitioner could "understand, remember, and carry out both simple and detailed work tasks" as part of the RFC determination,[7] but failed to address Dr. Sather's qualification that Petitioner's cognitive abilities are relatively unimpaired only when Petitioner's blood sugar is within a normal range. The opinions of the state agency reviewing physicians similarly missed the mark. (AR 70, 77, 82.)

    None of the evidence the ALJ relied upon is inconsistent with Dr. Sather's opinion that Petitioner would suffer an interruption in her cognitive functioning during the workday due to the unpredictability and frequency of her blood sugar episodes. The ALJ's failure to address the episodic nature of Petitioner's neurocognitive deficits is problematic, because the record contains evidence consistent with Dr. Sather's opinion. As set forth above, Dr. Sather's opinion is supported by Dr. Nielsen's opinion, Petitioner's testimony, and the objective evidence from Petitioner's CGM documenting blood sugar fluctuations throughout the day. Additionally, Dr. Nielsen's treatment notes document that Petitioner's blood sugar levels fluctuate, and Dr. Lijenquist suggests Petitioner may not always be aware of hypoglycemic episodes that occur at night. The ALJ offers no explanation for his rejection of the episodic nature of Petitioner's neurocognitive functioning as a result of her fluctuating glucose levels, and therefore the

---

[7] Dr. Sather determined Petitioner is able to "understand, remember, and carry out both simple and complex oral instructions unless her blood sugar is too low or too high…."

**MEMORANDUM DECISION AND ORDER - 15**

Court finds the ALJ erred.

Second, with regard to Dr. Eiler's opinion, the ALJ failed to address, let alone discuss, the impact of Petitioner's need to check her blood sugars throughout the day, and the effect that would have upon her ability to work. For instance, if Petitioner is required to leave her workstation to test herself, inject medication, and eat specific foods to correct her sugar levels at unpredictable times during a workday, such activities very well might exceed normal break periods and a lunch period. *See Noa v. Berryhill*, No. 17-CV-05147-MEJ, 2018 WL 1696819, at *9 (N.D. Cal. Apr. 6, 2018) (finding ALJ provided no support to her contention that the claimant would not need to take unscheduled breaks to test blood or administer injections due to diabetes). Despite receiving evidence regarding the measures Petitioner takes, and must take, to control her diabetes, and Petitioner's questions of the VE regarding someone who was off task a certain amount of time as a result, the ALJ did not address "the mechanics and time it would take [Petitioner] to" test herself, take her medications, and eat during the workday. *Id.*

Respondent's arguments offered in support of the ALJ's evaluation of Dr. Eiler's opinion also miss the mark. Petitioner astutely notes that Respondent agrees a diabetic like Petitioner must be allowed to check glucose levels and treat hypo or hyperglycemia as needed. (Dkt. 19 at 7.) But, Respondent argues the ALJ properly rejected the assertion Petitioner would need more than regular breaks to manage her glucose levels. This contention ignores that Dr. Eiler's opinion, considered with other evidence in the record establishing Petitioner's daily fluctuating glucose levels, offers contrary evidence the

**MEMORANDUM DECISION AND ORDER - 16**

ALJ failed to discuss.

Petitioner testified about how often she checks her blood sugar readings and corrects highs and lows. Throughout the record, Petitioner's diabetic condition is referred to as "brittle," and the record reflects that, despite medication and the use of a CGM, Petitioner's diabetes is difficult to manage. Nothing in the RFC determination accounts for Petitioner's need to immediately treat instances of hypo or hyperglycemia, thereby potentially interrupting the workday. The ALJ cannot simply ignore evidence that does not support his decision, especially when that evidence, if accepted, may change the analysis.

In sum, the ALJ did not consider the frequency, severity, or duration of Petitioner's fluctuating glucose levels and their effect on her cognitive functioning; the measures required to keep Petitioner's diabetes well managed; and whether those measures would more than minimally affect her ability to maintain fulltime, competitive employment. *See Ernesto S. S. By Ramirez v. Berryhill*, No. 2:17-CV-05928-KES, 2019 WL 285796, at *9 (C.D. Cal. Jan. 22, 2019) (ALJ erred by not considering whether the continued management of diabetes would require interruption of a typical workday beyond regular work breaks). The Court finds this failure constitutes harmful error in light of the vocational expert's testimony that an individual off task more than 10% of the workday, and in excess of regularly scheduled breaks, would be unemployable.

## CONCLUSION

Based on the above, the Court will remand this matter for further consideration.

**MEMORANDUM DECISION AND ORDER - 17**

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiff's Petition for Review (Dkt. 1) is **GRANTED**.

2) This action shall be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

3) This Remand shall be considered a "sentence four remand," consistent with 42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).

DATED: October 12, 2021

_____
Honorable Candy W. Dale
Chief United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 18**